**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **ROBERT A. BOYD,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Case No.: 2:14-CV-2290-VEH-HGD** |
| | ) |
| **THEODORE MASON and** | ) |
| **STANLEY SMALL,** | ) |
| | ) |
| **Defendants.** | ) |

---

## MEMORANDUM OPINION AND ORDER

## I.  INTRODUCTION

On October 22, 2014, Plaintiff Robert A. Boyd ("Mr. Boyd") initiated this lawsuit in the Circuit Court of Jefferson County against Theodore Mason ("Mr. Mason"), Tom Stanley, and Stanley Small ("Mr. Small"). (Doc. 1-1).[1] On November 25, 2014, Mr. Mason removed this action to federal court on the basis of diversity jurisdiction. (Doc. 1). On January 29, 2015, Mr. Boyd filed an amended complaint against Mr. Mason, Mr. Small, and Tom Stanley. (Doc. 14, the "Amended Complaint"). Mr. Small answered on February 24, 2015, and Mr.

---

[1] Any page references to ("Doc. __") correspond with the court's CM/ECF numbering system.

Mason answered on March 3, 2015. (Doc. 20, 21).[2]

On July 26, 2016, Mr. Small filed a Motion for Summary Judgment and supporting brief.[3] (Doc. 80, 81). Mr. Boyd responded on September 30, 2016, and Mr. Small replied on October 14, 2016. (Docs. 92, 96).The magistrate judge filed his Report and Recommendation on March 7, 2017. (Doc. 97). He recommended that Mr. Small's Motion for Summary Judgment be granted as to Counts 1, 2, 3, 4, 8, and 9, and as to any claim of promissory fraud or fraudulent suppression. However, he also recommended that the Motion for Summary Judgment be denied as to Counts 5, 6, 7, and 10.

On March 21, 2017, Mr. Small filed objections to the magistrate judge's Report and Recommendation. (Doc. 98). Mr. Boyd responded in turn on April 10, 2017, and Mr. Small replied on April 17, 2017. (Docs. 100, 101). Mr. Small's Motion for Summary Judgment is now ripe for this Court's disposition.

## II.     STANDARD

### A.     *De Novo* Review of Objections to Magistrate Judge's Findings

Before the Court engages in its own analysis, it is important to emphasize

---

[2] Tom Stanley was dismissed from the action on April 27, 2015. (Doc. 30).

[3] As the magistrate judge noted, "Mason has not filed any motion for summary judgment. Therefore, these recommendations are made only with regard to the claims against Small." (Doc. 97 at 27 n.8).

that the magistrate judge is not making any <u>final</u> factual determinations or rulings on summary judgment, but rather only providing recommendations. Instead, the Court has reviewed *de novo* those portions of the record that relate to the parties' objections and has separately and independently determined the correctness of any objected-to findings and recommendations.

This accepted process is set forth statutorily in 28 U.S.C. § 636, which states in part that:

**(b)(1)** Notwithstanding any provision of law to the contrary–

**(A)** a judge may designate a magistrate judge to hear and determine any pretrial matter pending before the court, except a motion for injunctive relief, for judgment on the pleadings, for summary judgment, to dismiss or quash an indictment or information made by the defendant, to suppress evidence in a criminal case, to dismiss or to permit maintenance of a class action, to dismiss for failure to state a claim upon which relief can be granted, and to involuntarily dismiss an action. A judge of the court may reconsider any pretrial matter under this subparagraph (A) where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law.

**(B)** <u>a judge may also designate a magistrate judge to conduct hearings, including evidentiary hearings, and to submit to a judge of the court proposed findings of fact and recommendations for the disposition, by a judge of the court, of any motion excepted in subparagraph (A)</u>, of applications for posttrial relief made by individuals convicted of criminal offenses and of prisoner petitions challenging conditions of confinement.

**(C)** the magistrate judge shall file his proposed findings and recommendations under subparagraph (B) with the court and a copy shall forthwith be mailed to all parties.

<u>Within fourteen days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court</u>. A judge of the court shall make a *de novo* determination of <u>those portions</u> of the report or specified proposed findings or recommendations <u>to which objection is made</u>. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b) (footnotes omitted) (emphases by underlining added).

Regarding the *de novo* review requirement in particular, a district court's obligation is to independently review those portions of the record to which objections are made, as opposed to reviewing the entire record. *See, e.g., Washington v. Estelle*, 648 F.2d 276, 282 (5th Cir. 1981) ("Both in his brief and at oral argument, Washington maintains that the District Court erred in reviewing *de novo* only the objected to portion of the magistrate's findings, rather than reviewing the entire record *de novo*.");[4] *id.* ("Based on the language of this order, we are convinced that the District Judge sufficiently complied with the act which requires 'a *de novo* determination of those portions of the report or specified

---

[4] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

proposed findings or recommendations to which objection is made.') (quoting 28 U.S.C. § 636(b)(1)(C)).[5]

Additionally, it is incumbent upon the parties to timely raise <u>any</u> objections that they may have regarding a magistrate judge's findings contained in the report and recommendation, as the failure to do so subsequently waives or abandons the issue even if such matter was presented at the magistrate judge level. *See, e.g., United States v. Pilati*, 627 F.3d 1360, 1365 (11th Cir. 2010) ("While Pilati raised the issue of not being convicted of a qualifying offense before the magistrate judge, <u>he did not raise this issue in his appeal to the district court. Thus, this argument has been waived or abandoned</u> by his failure to raise it on appeal to the district court.") (emphasis added).

## B.     <u>Summary Judgment Standard</u>

---

[5] In *Washington*, the district judge's order adopting the magistrate judge's proposed decision stated:

> The Court having considered the Findings and Recommendations of the United States Magistrate filed on September 19, 1979, and the Court further having reviewed and considered the written objections filed by the Petitioner herein on October 2, 1979, and <u>the Court having made a de novo review of the objections raised by the Petitioner</u> and the Court being of the opinion that the findings are correct and that the objections are without merit,
>
> IT IS, THEREFORE, ORDERED that the Findings, Conclusions and Recommendations of the United States Magistrate are adopted.

648 F.2d at 282 (emphasis added).

Under Federal Rule of Civil Procedure 56, summary judgment is proper if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 2265 (1986) ("[S]ummary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.") (internal quotation marks omitted).

The party requesting summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S. Ct. at 2553. Once the moving party has met its burden, Rule 56(c) requires the non-moving party to go beyond the pleadings in answering the movant.[6] *Id.* at 324, 106 S. Ct. at 2553. By its own affidavits – or by the depositions, answers to interrogatories, and admissions on file – it must designate specific facts showing that there is a genuine issue for trial. *Id.*

---

[6] When *Celotex* was decided, FED. R. CIV. P. 56(e) encompassed this express requirement, but now this concept is covered by the language provided for under FED. R. CIV. P. 56(c).

The underlying substantive law identifies which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d. 202 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000). Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* If the evidence presented by the non-movant to rebut the moving party's evidence is merely colorable, or is not significantly probative, summary judgment may still be granted. *Id.* at 249, 106 S. Ct. at 2511.

How the movant may satisfy its initial evidentiary burden depends on whether that party bears the burden of proof on the given legal issues at trial. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). If the movant bears the burden of proof on the given issue or issues at trial, then it can only meet its burden on summary judgment by presenting *affirmative* evidence showing the absence of a genuine issue of material fact – that is, facts that would entitle it to a directed verdict if not controverted at trial. *Id.* (citing *United States v. Four*

*Parcels of Real Property*, 941 F.2d 1428, 1438 (11th Cir. 1991)). Once the moving party makes such an affirmative showing, the burden shifts to the non-moving party to produce "significant, probative *evidence* demonstrating the existence of a triable issue of fact." *Id.* (emphasis added).

For issues on which the movant does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. *Id.* at 1115-16. First, the movant may simply show that there is an absence of evidence to support the non-movant's case on the particular issue at hand. *Id.* at 1116. In such an instance, the non-movant must rebut by either (1) showing that the record in fact contains supporting evidence sufficient to withstand a directed verdict motion, or (2) proffering evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *Id.* at 1116-17. When responding, the non-movant may no longer rest on mere allegations; instead, it must set forth evidence of specific facts. *Lewis v. Casey*, 518 U.S. 343, 358, 116 S. Ct. 2174, 2183, 135 L. Ed. 2d 606 (1996). The second method a movant in this position may use to discharge its burden is to provide affirmative *evidence* demonstrating that the non-moving party will be unable to prove its case at trial. *Fitzpatrick*, 2 F.3d at 1116. When this occurs, the non-movant must rebut by offering *evidence* sufficient to withstand a directed verdict at trial on the material

fact sought to be negated. *Id.*

## III. FACTUAL BACKGROUND

As neither party has objected to the magistrate judge's description of the factual background of the case in his Report and Recommendation, that section is set out in full, with no alteration:

Plaintiff Robert A. Boyd holds a Bachelor of Science in Accounting from the University of Alabama, has worked as a Certified Public Accountant (CPA) for approximately 40 years, and is licensed to practice in 15 states. (Boyd Depo. at 19, 21). Boyd has been a Certified Fraud Examiner (CFE) certified by the Association of Certified Fraud Examiners since 2005. Boyd is a member of an accounting firm and is a partner in Yeager and Boyd CPAs (Y&B). (*Id*. at 7). Plaintiff acknowledges that, during 2012, he carried with him the knowledge available to a CPA or CFE to identify fraud and had the ability to exercise professional care and look out for his own financial welfare the same way he does for his clients. (*Id*. at 55-57). He holds himself out as a consultant in the identification, detection and prevention of fraud. (*Id*. at 212). Boyd also has served as an expert witness, testifying as a CPA in a case involving accusations of fraud. (*Id*. at 41-42).

Defendant Stanley Small is a contractor and owner of Air Comfort Company, a company that specializes in heating and air conditioning. (Small Depo. at 19-20). Defendant Theodore Mason is an attorney with the law firm of Greenberg, Traurig, LLP, and practices in the state of Pennsylvania. (Mason Depo. at 27, 32). However, Mason also represents "purchasers of assets by investors who are looking to buy." (*Id*. at 33). According to Small, he and Mason were, prior to the events that are the basis of this lawsuit, involved in numerous investment deals together, including bond, real estate and gold deals. (Small Depo. at 58-59). Among other things, Small had previously provided $150,000 that was supposed to be invested in a gold mine through a person identified as A.D. Singh. However, that money was apparently never invested in a

gold mine and was lost or stolen. (*Id*. at 58-63). Small testified that Mason "brought the deal" for the gold to Small. (*Id*. at 63-64). However, Mason claims that it was Small who introduced him to Singh and "brought the gold opportunity" to Mason. (Mason Depo. at 64). Small testified that he later learned that Mason never invested any of his own money in the deal. (Small Depo. at 61). The money invested by Small was lost. (*Id*. at 62).

Small testified that he made attempts to get back the money he invested in the gold mine. Although the details vary and sometimes conflict between the testimonies of Small and Mason, it is undisputed that these attempts to find A.D. Singh and get back the money invested in the gold scheme led them to an individual known as Brian Malthus, who represented himself as working for the CIA. (Small Depo. at 88, 130). This, in turn, led them to talk to individuals identified as Foster and Bell, also allegedly with the CIA, who were supposedly going to help them get the money back. According to Small, Malthus informed him that the CIA was aware of Singh and his activities. He advised them that they could "turn him over" to the IMF[7] and there would be a finder's fee they could collect. Then, later, Malthus provided them with "option two." (*Id*. at 138-39). Under this option, Malthus offered them the opportunity to invest in a CIA "trading platform." According to Small, the CIA did not want to take down Singh just yet because it wanted to watch him to see if he would lead it to others who were higher up in whatever organization in which he was involved. Therefore, in return for agreeing not to pursue Singh at this time, they were offered the opportunity to invest in the trading platform. (*Id*. at 140-44). Small testified that he and others were told that they would receive eight times their investment at one point and ten times their investment at another. (*Id*. at 144-45). According to Small, he and Mason were both communicating with Malthus and both thought they were dealing with a real CIA agent. (*Id*. at 146). In fact, at one time on a non-video Skype call, Small was involved in a conversation with Malthus, another

---

[7] (*See* Doc. 97 at 7 n.1) ("The 'IMF' referred to is presumably the International Monetary Fund; however, this is never explained nor is there any discussion of what law enforcement powers, if any, are possessed by the IMF.").

supposed CIA-agent called Trish Weiss, and Leon Panetta, whom Small believed was the Director of the CIA.[8] (*Id.* at 148).

In order to participate in the trading platform, Malthus informed Small that he would need to raise about $1,800,000. (Small Depo. at 145). Upon learning of this investment opportunity, Small contacted plaintiff Robert Boyd, an accountant with whom he was acquainted from a prior business deal, to see if any of his clients would be interested in participating. (Boyd Depo. at 198-99). Boyd learned of this at some time between July 1 and July 16, 2012. (*Id.* at 109, 114, 118, 123).

Boyd was unable to explain with any specificity just how the trading platform was designed to work. However, he believed that it was "very safe" and that the eight-to-one return was tax-free. (*Id.* at 185-86). Boyd testified that Small told him the investment was "a hundred percent safe" because the deal was "wired in one level below the President of the United States, namely Leon Panetta." He was also convinced it was safe because of the involvement of a "five-star" lawyer like Ted Mason. (*Id.* at 197).

In addition to an eight-to-one return, Boyd testified that he was told by Small that he would receive his investment back within two months and profits within three months. (*Id.* at 129-30, 135-37). Boyd acknowledges that he did nothing to investigate the validity of the claims or the investment before investing his money, despite being a trained CFE and having the means and ability to do so. (*Id.* at 127-28). Likewise, he did not ask for any background information on the investment or review any documentation that would verify the reasonableness and safety of the investment. (*Id.* at 124-25, 245-46).

Boyd did discuss the trading platform with his brother, Charles Boyd, who is also a CPA and CFE, to see if he wanted to participate. Charles Boyd declined because the risk involved was intolerable to him. (Charles Boyd Depo. at 21, 23-24). Charles Boyd considers lack of

---

[8] (*See* Doc. 97 at 7 n.2) ("As it turns out, at the time of the call, Panetta was no longer the head of the CIA.").

documentation and unsolicited offers to invest in investment schemes to be "red flags" that an investment is fraudulent. (*Id*. at 54).

Instead of providing the names of clients who might be interested in participating in the trading platform, Boyd chose to participate himself. (Boyd Depo. at 104-05). On July 16, 2012, Boyd attempted to make his first investment to the trading platform by wiring $250,000 through Citizens Bank to a bank in Nigeria. (*Id*.). Citizens Bank refused to wire the funds because such a transfer raised a fraud alert. (*Id*. at 94-96). According to Boyd, Small then directed him to send $125,000 to Regions Bank in Mobile in the name of Voncille Smith. Boyd did this on July 19, 2012. At Mr. Boyd's request, First Partners Bank wired $125,000 to the Regions account held by Ms. Smith. Ms. Smith then wired this money to Nigeria based on information she received from Stanley Small. (*Id*. at 163-64; V. Smith Depo. at 28- 29).

Boyd made a second contribution to the investment in the amount of $250,000 on July 27, 2012. First Partners wired $250,000 to the Regions account held by Ms. Smith. (Boyd Depo. at 165). Ms. Smith then wired the money to Nigeria on July 30, 2012.

Small also secured a loan of $100,000 on July 27, 2012, to invest in the platform. (Small Depo. at 164-65; Silverstein Depo. at 33, 36). In accordance with this loan, $100,000, less a wire transfer fee of $10, was wired from Silverstein's Merrill-Lynch account on July 30, 2012, to Teldrhein Global Inv. LTD account at United Bank for Africa. (DX 16, Account Statement for Teldrhein Global; DX 17, Merrill-Lynch wire confirmation of July 30, 2012).

After this first round of investments, Malthus contacted Small to see if anyone was interested in participating in a second round of investments. Small relayed this information to Boyd. The return on this investment was said to be ten-to-one. (Boyd Depo. at 189; Small Decl. at ¶¶ 8-9). Boyd was supposed to have his investment returned within two months and his profits within four months. (Boyd Depo. at 190, 226-27).

On August 6, 2012, Boyd directed First Partners to wire $62,500 from a Y&B business account to Ms. Smith's account at Regions. (Boyd Depo. at 167-68). Although the money came from a Y&B account, Boyd asserts that the money was his draw and that he had the authority to do so. (*Id*. at 74-81). The Y&B partnership agreement requires that each partner must agree to a partner's removal of capital or making a draw. Boyd asserts that none of his partners has any objection or dispute with these draws. Charles Boyd testified that the money taken by Robert Boyd was his (Robert's) draw. Rebecca McCune testified that, although the partnership agreement required all partners to agree on a draw, "we aren't that formal," and Thomas Carr had no opinion as to whether Boyd "did anything wrong" by making these draws. (Charles Boyd Depo. at 39-40; McCune Depo. at 33; Carr Depo. at 33-34).

On August 7, 2012, Ms. Smith wired the $62,500 from Boyd to the United Bank for Africa. (Boyd Depo. at 167-68). On August 13, 2012, Boyd directed First Partners to wire $112,500 from a Y&B business account to Ms. Smith's Regions account. She wired this money, along with money from another investor, to the United Bank for Africa on August 14, 2012. (DX 21, Wire Transfer; Smith Depo. at 46-47).

Based on representations made to him, Boyd expected to receive his first-leg investment back on or about September 19, 2012. (Boyd Depo. at 227-28). When he did not receive his investment back on time, Boyd started to worry and began calling Small quite a bit. (*Id*. at 229). Boyd testified that he was not yet convinced that he had a problem because Small kept giving him reasons why the money had not yet been delivered. One such excuse was that they had talked to "people at Langley" or "CIA people" and that the CIA had a committee that met in October that had to approve the payment. (*Id*. at 229-30). Boyd testified that, on another occasion, Small told him that Brian or "one of the guys" was either sick and in the hospital or had died and that this had delayed things. (*Id*. at 231). According to Boyd, as late as April 2014, Small represented that "the trading platform was still alive and that it would go." (*Id*. at 238). He testified that this went on all the way to May of 2014, with Small assuring him that payment was imminent. (*Id*. at 232).

Small denies telling Boyd that the investment was "100% safe," but admits that he told Boyd that alleged CIA Agent Brian Malthus told him it was 100% safe and that he told Boyd that Malthus had told him this. (Small Depo. at 180-81). However, Boyd testified that he has no information to indicate that Small did not believe that there was a trading platform or that he did not really believe that they would receive a return at eight to ten times the amount they invested in the platform. (Boyd Depo. at 268-69). Small stated that he would not have invested money in the platform if he had not thought that it was a good deal. (Small Depo. at 188). He admitted that he "put money into it. Lots of it." (*Id*. at 178-88).

In fact, prior to the due date for receiving the return of his first investment, Small participated in a second leg of the investment by securing loans from Mr. Silverstein for $275,000 on August 6, 2012, and $40,000 on August 31, 2012. (Small Depo. at 164-65; Silverstein Depo. at 33, 36). This money was wired from Mr. Silverstein's account on August 6, 2012, and August 31, 2012, to the Teldrhein Global Inv. LTD account with the United Bank for Africa.[9] None of the money invested by any party was ever returned and none of the parties has been able to determine exactly what happened to it.[10]

(Doc. 97 at 5-13).

## IV. ANALYSIS

---

[9] (*See* Doc. 97 at 13) ("In another tangentially related transaction, Boyd also loaned money to a Steven Miller in the amount of $50,000 in October 2013 with the expectation that Miller would pay him $75,00 within 45 days. In consideration for Boyd providing the loan to Miller, Mason agreed in an email to repay Boyd $550,000 "for that loan and for previous investments." (DX 31, Oct. 30 email from Mason to Boyd). The text of the email reflects that "previous investments" is a reference to the trading platform. (*Id.*). Small was not a party to this agreement. (Small Decl. at ¶ 13).").

[10] (*See id.*) ("Small went so far as to go to CIA Headquarters in Langley, Virginia, to try to find out what happened to the money and was almost arrested for his efforts. (Small Depo at 74-75).").

## A.    **Preliminary Matters**

In the "Preliminary Matters" section of his Report and Recommendation, the magistrate judge addressed and disposed of certain claims that were undisputed by the parties at summary judgment. His recommendations as to those claims are set out in full as follows:

> Counts 1, 2 and 3 of plaintiff's amended complaint allege violations of the Racketeer Influenced Corrupt Organizations statute (RICO), 18 U.S.C. § 1961, *et. seq.* Count 8 of the amended complaint asserts a claim for breach of contract. Counsel for plaintiff concedes that summary judgment is due to be granted with regard to Counts 1, 2 and 3. (Doc. 92, Response in Opposition to Summary Judgment, at 37-38). Therefore, it is RECOMMENDED that Small's motion for summary judgment as to these claims be GRANTED.
>
> Furthermore, plaintiff did not submit any opposition to the motion for summary judgment with regard to the breach of contract claim found in Count 8, stating in his brief that defendant's "motion for summary judgment is due to be denied as to Counts 4, 5, 6, 7, 9, and 10." (*Id.* at 38). Consequently, it appears that plaintiff also does not oppose defendant's motion for summary judgment as to the claim in Count 8 of the amended complaint. Therefore, it is RECOMMENDED that defendant's motion for summary judgment as to Count 8 be GRANTED, as well. Based on this, there will be no further discussion of the claims contained in these four counts.
>
> The remaining claims are as follows: Count 4, Breach of Implied Covenants of Good Faith and Fair Dealing; Count 5, Fraudulent Misrepresentation and/or Omission; Count 6, Negligent/Wanton Misrepresentation; Count 7, Mistake/Innocent Misrepresentation and/or Omission; Count 9, Breach of Fiduciary Duty; and Count 10, Civil Conspiracy. (Doc. 14, Amended Complaint).

(Doc. 97 at 2-3). Neither party has contested the magistrate judge's findings as to Counts 1, 2, 3, and 8[11] in subsequent briefing before this Court. Accordingly, the Court will **ADOPT** the magistrate judge's recommendations as to Counts 1, 2, 3, and 8. Summary judgment is due to be **GRANTED** as to the claims brought against Mr. Small in Counts 1, 2, 3, and 8.

### B.     Breach of Fiduciary Duty and Breach of Implied Covenant of Good Faith and Fair Dealing Claims

In his Report and Recommendation, the magistrate judge recommended that summary judgment be granted on the merits as to Count 4, in which Plaintiff alleged that Defendants violated the implied covenant of good faith and fair dealing. (Doc. 97 at 22). He also recommended that summary judgment be granted on the merits as to Count 9, in which Plaintiff alleged that Defendants breached their fiduciary duties towards Mr. Boyd. (*Id.* at 25). Mr. Boyd has not objected to either recommendation. Accordingly, the Court will **ADOPT** the magistrate judge's recommendations as to these counts. Summary judgment is due to be **GRANTED** as to the claims brought against Mr. Small in Counts 4 and 9.

### C.     Misrepresentation Claims

---

[11] This Court also notes that Count 8 appears to have been brought only against Mr. Mason. (Doc. 14 at 16). Regardless, Mr. Boyd has not contested the magistrate judge's recommendation to grant summary judgment in Count 8 <u>as to Mr. Small</u>.

In Counts 5, 6, and 7 of the Amended Complaint, Mr. Boyd asserted claims for fraudulent misrepresentation, negligent or wanton misrepresentation, and innocent or mistaken misrepresentation. Mr. Small has objected to the magistrate judge's recommendations as to those counts.

### 1. *Promissory Fraud and Fraudulent Suppression Claims*

In his Report and Recommendation, the magistrate judge granted summary judgment as to Counts 5, 6, and 7 to the extent that Mr. Boyd intended to raise claims of promissory fraud or fraudulent suppression. (Doc. 97 at 16-18, 20). As Mr. Boyd has not objected to the granting of summary judgment on these grounds, the Court hereby **ADOPTS** the magistrate judge's recommendation and **GRANTS** summary judgment in Counts 5, 6, and 7 to the extent Mr. Boyd has asserted promissory fraud or fraudulent representation claims.

### 2. *Fraudulent Misrepresentation Claims*

The magistrate judge recommended that summary judgment be denied to the extent that Counts 5, 6, and 7 may be construed as asserting fraudulent misrepresentation claims because Mr. Boyd "has established a *prima facie* case of fraudulent misrepresentation under *Ala. Code* § 6-5-101." (Doc. 97 at 20). Mr. Small contends in his objections to the Report and Recommendation, as he did in his Motion for Summary Judgment (doc. 81 at 33-36), that he is entitled to

17

summary judgment as to the fraudulent misrepresentation claims because they are barred by the applicable two year-statute of limitations. For the following reasons, this Court agrees with Mr. Small and respectfully rejects the magistrate judge's recommendation as to Counts 5, 6, and 7.

The elements of a fraudulent misrepresentation claim are (1) a "misrepresentation of material fact"; (2) "made willfully to deceive, recklessly, without knowledge, or mistakenly"; (3) which was "justifiably relied on by the plaintiff under the circumstances" and (4) which "caused damage as a proximate consequence." *Foremost Ins. Co. v. Parham*, 693 So.2d 409, 422 (Ala. 1997). An innocent misrepresentation is "as much a legal fraud as an intended misrepresentation," and the good faith of a party is "immaterial as to the question whether there was an actionable fraud if the other party acted on the misrepresentation to his detriment." *Smith v. Reynolds Metals Co.,* 497 So. 2d 93, 95 (Ala. 1986).

In Alabama, a fraud claim must be brought within two years of the accrual of the claim. *Auto-Owners Ins. Co. v. Abston*, 822 So.2d 1187, 1194 (Ala. 2001) (citing Ala. Code 1975, § 6-2-38(l)). "However, where § 6-2-38(l) has created a bar to a fraud claim, 'the claim must not be considered as having accrued until the discovery by the aggrieved party of the fact constituting the fraud.' Ala. Code

1975, §6-2-3." *Id.* As the Alabama Supreme Court has stated,

> """"The question of when a party discovered or should have discovered the fraud is generally one for the jury."""" *Potter v. First Real Estate Co.*, 844 So.2d 540, 546 (Ala. 2002)(quoting *Ex parte Seabol*, 782 So.2d 212, 216 (Ala. 2000), quoting in turn *Liberty Nat'l Life Ins. Co. v. Parker*, 703 So.2d 307, 308 (Ala.1997)). "However, a party will be deemed to have 'discovered' a fraud <u>as a matter of law upon the first of either the actual discovery of the fraud or when the party becomes privy to facts that would provoke inquiry in a reasonable person that, if followed up, would lead to the discovery of the fraud</u>." *Dickinson v. Land Developers Constr. Co.*, 882 So.2d 291, 298 (Ala. 2003).

*Jones v. Kassouf & Co., P.C.*, 949 So.2d 136, 140 (Ala. 2006) (emphasis added).

In order to succeed on his misrepresentation claims, Mr. Boyd must establish that he relied on Mr. Small's representations and that his reliance was in fact reasonable, a determination that is "based on all of the circumstances surrounding a transaction, including the mental capacity, educational background, relative sophistication, and bargaining power of the parties." *Foremost*, 693 So.2d at 421; *see also id.* (adopting the "reasonable reliance" standard set out in *Torres v. State Farm Fire & Casualty Co.*, 438 So.2d 757, 758-59 (Ala. 1980) ("In order to recover for misrepresentation, the plaintiffs' reliance must, therefore, have been reasonable under the circumstances. If the circumstances are such that a reasonably prudent person who exercised ordinary care would have discovered the true facts, the plaintiffs should not recover.")). Fraud is considered to have been

discovered "when it ought to have been discovered. It is sufficient to begin the running of the statute of limitations that facts were known which would put a reasonable mind on notice that facts to support a claim of fraud might be discovered upon inquiry." *Auto-Owners Ins. Co.*, 822 So.2d at 1195 (quoting *Jefferson Cty. Truck Growers Ass'n v. Tanner*, 341 So. 2d 485, 488 (Ala. 1977)).[12]

First, it is undisputed that Mr. Boyd's brother declined to invest in the trading platform due to the lack of proper documentation, unsolicited offers to invest, and other "red flags" that amounted to an intolerable level of investment risk. (Doc. 97 at 9)(citing Charles Boyd Depo., Doc. 82-6 at 7(21-24), 15(54-55)).

---

[12] As another district court within this Circuit has noted,

Two limitations to the *Foremost* [reasonable reliance] rule have been recognized by Alabama courts. Under Alabama law, an individual is not capable of discovering fraud of negligent misrepresentation by reading and understand[ing] the terms of a contract if he or she is illiterate. *Potter v. First Real Estate Company, Inc.*, 844 So. 2d 540, 547 (Ala. 2002). In additional, discovery of the fraud should not be deemed, as a matter of law, to have occurred upon the plaintiff's receipt of documents, if such document is ambiguous, i.e. capable of more than one interpretation, and thus hard to understand. *See Id.* (discussing *Ex parte Seabol*, 782 So. 2d 212, 216-17 (Ala. 2000) (distinguishing *Foremost*; finding that where underlying documents are not easily understood, plaintiff's reliance on oral representations concerning documents is reasonable).

*Waldrup v. Hartford Life Ins. Co.*, 598 F. Supp. 2d 1219, 1230 (N.D. Ala. 2008). The first limitation is clearly inapplicable, and the second limitation, as set out in *Seabol*, is factually distinguishable. In this case, Mr. Small claims that accrual of the statute of limitations was triggered not by ambiguous documents but by a conversation that Mr. Boyd (a certified CPA/CFE) had with his brother (also a certified CPA/CFE), a discussion that Mr. Boyd had with an individual in a bank's fraud department, and Mr. Boyd's failure to receive promised funds by the promised deadline.

Second, it is undisputed that when Mr. Boyd first attempted to invest in the trading platform by wiring $250,000 to a bank in Nigeria, Citizens Bank refused to wire the funds *because such a transfer raised a fraud alert*. (*Id.* at 9). In fact, when pressed on his conversation with Citizens Bank, Mr. Boyd testified as follows:

Q: Do you recall that you spoke with Citizens Bank in July of 2012?

A: I did.

Q: Do you recall that you spoke with someone from the Fraud Department at Citizens Bank in 2012?

A: We did.

Q: Not we. You did, didn't you?

A: I did.

Q: So in 2012, July, you spoke with a person from the Fraud Department of Citizens Bank in Pennsylvania.

A: Okay.

Q: Is that true?

A: That is true.

Q: And the person at Citizens Bank told you that they would not wire money to Nigerian banks because of their fear of fraud; is that true?

A: Yes.

Q: And for that reason, Citizens Bank refused to send money to

Nigeria, correct?

Q:    Is that true or not?

A:    Repeat the question.

Q:    That Citizens Bank refused to send the money to Nigeria?

A:    Yes.

(Doc. 82-1 at 25(95:15-96:19)) (emphasis added). Mr. Boyd had *actual*

knowledge, based on a conversation he *personally* had with an individual in the

Fraud Department at Citizens Bank, that the bank refused to complete the wire

fund transfer in question *because it had been flagged as fraudulent*.

Third, even after the Fraud Department at Citizens Bank brought its

concerns about the transfer to his attention, Mr. Boyd decided to wire $125,000.00

through another bank, Regions Bank, on July 19, 2012. It is undisputed that Mr.

Boyd expected to receive a return on this significant investment on or about

September 19, 2012. (Doc. 91 at 11). Mr. Boyd further testified as follows:

Q:    When did you first think something was wrong?

A:    Well –

Q:    I mean, you get two months out, July 19, that's September 19 –

A:    You know, maybe on into September when the first money didn't

come back, but there was such logical reasons given for the delay, and then –

Q:    Let's just take that first as a time point, and I'm going to ask you about what reasons were given.

A:    Okay.

Q:    So you get out here two months, and under the agreement, two months after you put the money in, you're supposed to get your money back, your principal back?

A:    Uh-huh.

Q:    Two months.

A:    Uh-huh.

Q:    So that means by the second half of September, you're supposed to get your principal back?

A:    For the first leg. That's part of that five hundred and fifty thousand.

Q:    That's what you expected to happen?

A:    I sure did.

Q:    If it was a hundred percent safe, that's what you would have seen happen, right? You would have gotten your money back at the end of the two months?

A:    Yeah.

Q:    And then the end of the two-month period came, and you didn't get your money back, did you?

A:     That's right.

(Doc. 82-1 at 58(227:9-228:21)) (emphases added).

Taken together, Mr. Boyd's testimony establishes that he was privy to facts and information that would provoke inquiry in the mind of a reasonable person as to whether a fraud had been perpetrated. By September 19, 2012, at the latest, Mr. Boyd knew or reasonably should have known that the trading platform scheme was deeply flawed because he should have started receiving a return on his investment. In this case, there were numerous "red flags" that would have put a reasonable person on notice of the fraud.

Mr. Boyd filed his complaint on October 22, 2014, more than two years after he became aware, or should have become aware, of facts that upon inquiry would have led to the discovery of the fraudulent scheme. When examined under these objective standards, the Court finds as a matter of law that the limitations period for Mr. Boyd's claims expired prior to October 22, 2014. Therefore, Mr. Boyd's misrepresentation claims are barred by the applicable statute of limitations, and Mr. Small's Motion for Summary Judgment is due to be **GRANTED** as to the misrepresentation claims in Counts 5, 6, and 7.

### D.     Civil Conspiracy

In Count 10 of the Amended Complaint, Mr. Boyd asserted civil conspiracy

claims against Defendants.[13] (Doc. 14 at 17). As the magistrate judge noted (doc. 97 at 26),

> [a] plaintiff alleging a conspiracy must have a valid underlying cause of action. [*Drill Parts & Serv. Co. v. Joy Mfg. Co.*, 619 So. 2d 1280, 1290 (Ala. 1993)]. "[A] conspiracy claim must fail if the underlying act itself would not support such an action." *Triple J. Cattle, Inc. v. Chambers*, 621 So. 2d 1221, 1225 (Ala. 1993).

(Doc. 97 at 26-27) (citing *Callens v. Jefferson Cty. Nursing Home*, 769 So. 2d 273, 280 (Ala. 2000)). Accordingly, the magistrate judge determined that "the only remaining underlying tort[s] that could support a claim of civil conspiracy [were] the misrepresentation claims set out in Counts 5, 6, and 7." *Id.* at 26. Because the magistrate judge believed that Mr. Boyd "alleged valid underlying causes of action" in Counts 5, 6, and 7, he similarly concluded that Mr. Boyd stated a claim of civil conspiracy sufficient to survive summary judgment. *Id.* at 27.

In his objections, Mr. Small agrees that the only remaining underlying claims that could support a civil conspiracy claim were those found in Counts 5, 6, and 7. (Doc. 98 at 15). However, he has persuasively argued that summary judgment is due to be granted as to Counts 5, 6, and 7, leaving no remaining claim upon which the civil conspiracy claim could rest. Mr. Small also argues that, under

---

[13] Though the Amended Complaint states generally that Count 10 is brought against "Defendants," the Court construes this Count as brought against the two remaining defendants in this action, Mr. Small and Mr. Mason.

Alabama law, a claim for civil conspiracy "requires intent to harm and cannot be predicated upon alleged negligent or innocent actions." *Id.*

In response, Mr. Boyd does not contest the magistrate judge's determination that the only underlying claims that could support his civil conspiracy claim are the fraudulent misrepresentation claims in Counts 5, 6, and 7. Instead, he argues that Mr. Small has failed to point to any authority under Alabama law to support his contention that a civil conspiracy claim requires intent. (Doc. 100 at 4). Mr. Boyd therefore urges this Court to adopt the magistrate judge's recommendation as to Count 10 on this basis. (*Id.*). In his reply, Mr. Small cited to Alabama case law allegedly requiring intent to establish a civil conspiracy claim. (Doc. 101 at 8).

Because this Court has independently determined that summary judgment is due to be granted as to Counts 5, 6, and 7, no underlying cause of action against Mr. Small remains to support the civil conspiracy claims against him. Accordingly, this Court need not reach the question of whether intent is required to establish a civil conspiracy claim under Alabama law, and summary judgment is due to be **GRANTED** as to Count 10.[14]

---

[14] Furthermore, because this Court has determined that summary judgment will be granted as to all claims against Mr. Small, the Court need not address Mr. Small's argument that Mr. Boyd lacks standing to recover funds that were transferred from a Yeager & Boyd ("Y&B") business account and invested in the trading platform. (*See* Doc. 98 at 16-17, Doc. 101 at 9-11).

## V. CONCLUSION

Having carefully considered the Report and Recommendation as well as Mr. Small's objections, and having reviewed *de novo* those portions of the record that relate to those objections, the magistrate judge's Report and Recommendation (doc. 97) is hereby **ADOPTED IN PART** and **REJECTED IN PART**. Mr. Small's Motion for Summary Judgment (doc. 80) is **GRANTED** on the merits, and Mr. Boyd's claims against Mr. Small are hereby **DISMISSED WITH PREJUDICE**. The Clerk of Court is hereby **DIRECTED** to terminate Mr. Small as a party defendant.[15]

This case will be set by separate order for a pretrial conference on Plaintiff's remaining claims against Mr. Mason.

**DONE** and **ORDERED** this the 24th day of May, 2017.

_____
**VIRGINIA EMERSON HOPKINS**
United States District Judge

---

[15] Accordingly, the case caption of future filings shall name only "Theodore Mason" as a party defendant.